# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| JULIA RUSSO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 3:20-cv-00820** |
| | ) | **Judge Aleta A. Trauger** |
| MOORE INGRAM JOHNSON & | ) | |
| STEELE, LLP, | ) | **LEAD CASE** |
| | ) | |
| Defendant. | ) | |

*CONSOLIDATED WITH:*

| | | |
|---|---|---|
| JULIA RUSSO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 3:21-cv-00535** |
| | ) | **Judge Aleta A. Trauger** |
| MOORE INGRAM JOHNSON & | ) | |
| STEELE, LLP, | ) | **MEMBER CASE** |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM</u>

Before the court is a Motion to Dismiss Plaintiff's Amended Complaint (Doc. No. 48) filed by defendant Moore Ingram Johnson & Steel, LLP ("Moore Ingram"), which seeks the dismissal of the Amended Complaint filed by plaintiff Julia Russo in the Member Case, No. 3:21-cv-00535, in this consolidated action (Member Case, Doc. No. 17). The Amended Complaint asserts eleven different "counts" or claims for relief based on alleged violations of the Family and Medical Leave Act ("FMLA"), the Americans with Disabilities Act ("ADA"), the Families First Coronavirus Response Act ("FFCRA"), the Tennessee Disability Act ("TDA"), and the Tennessee Public

Protection Act ("TPPA").[1] For the reasons set forth herein, the motion will be granted in part and denied in part.

## I.     STANDARD OF REVIEW

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a

---

[1] In the Lead Case, the plaintiff's Complaint asserts claims under the Fair Labor Standards Act and state law based on the defendant's alleged failure to pay her overtime compensation and wages for all work performed. (Case No. 3:20-cv-820, Doc. No. 1.) The present motion does not address those claims.

plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556. According to the Supreme Court, "plausibility" occupies that wide space between "possibility" and "probability." *Iqbal*, 556 U.S. at 678. If a reasonable court can draw the necessary inference from the factual material stated in the complaint, the plausibility standard has been satisfied.

In addition to the complaint, the court may consider "any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008); *see also New Eng. Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003).

Generally, "when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *Creelgroup, Inc. v. NGS Am., Inc.*, 518 F. App'x 343, 347 (6th Cir. 2013). At the same time, however, the Sixth Circuit has cautioned against elevating statements in an exhibit to a motion to dismiss over contradictory allegations stated in a complaint, where the exhibit is not the basis for the allegations in the complaint. *See Jones v. City of Cincinnati*, 521 F.3d 555, 561 (6th Cir. 2008) ("Where a plaintiff attaches to the complaint a document containing unilateral statements made by a defendant, where a conflict exists between those statements and the plaintiff's allegations in the complaint, and where the attached document does not itself form the basis for the allegations, Rule 10(c) does not require a plaintiff to adopt every word within the exhibits as true for purposes of pleading simply because the documents were attached to the complaint to support an alleged fact." (citation and internal quotation marks omitted)).

## II.     FACTS AND PROCEDURAL HISTORY

The defendant is a law firm with multiple offices in several states, including an office in Brentwood, Tennessee. The plaintiff was employed by the defendant as a legal assistant from

August 2018 until the events giving rise to this lawsuit in 2020. It is undisputed that Moore Ingram is subject to the requirements imposed by the FMLA, the ADA, the FFCRA, and the TDA.

According to the allegations in the Amended Complaint, plaintiff Julia Russo has a "family history" of Guillain-Barre syndrome ("GBS").[2] (Doc. No. 17 ¶ 14.) Her father, maternal grandfather, and maternal aunt have all suffered from this condition. Upon the advent of the COVID-19 pandemic, the plaintiff began suffering from "severe anxiety related to being potentially exposed to COVID-19," based in particular on her belief that she, as a person with a family history of GBS, would be at increased risk of death or serious illness if she contracted COVID-19. (Id. ¶ 15.) The plaintiff alleges that her severe anxiety "substantially limited major life activities, including working out of the home, visiting stores and other venues where other people may be physically present, and interacting with other people in-person." (Id. ¶ 16.) She also claims that her COVID-related anxiety was exacerbated by Moore Ingram's "lax attitude toward preventing COVID-19 transmission" at its offices. (Id. ¶ 17.) In particular, according to Russo, Moore Ingram did not require employees working on-site to wear masks or take steps to stagger shifts or reduce the number of people working at its offices, and its Brentwood office is relatively small with an "open" floorplan. (Id. ¶¶ 22–23.)

On March 24, 2020, the defendant, through its Firm Administrator Tony Lemons, sent an email to all of Moore Ingram's staff, outlining the firm's response to the COVID-19 pandemic. (Id. ¶ 25; see also Member Case, Doc. No. 1-1.[3]) Among other things, the email emphasized the

---

[2] GBS is "a rare neurological disorder in which the body's immune system mistakenly attacks part of its peripheral nervous system." https://www.ninds.nih.gov/health-information/patient-caregiver-education/fact-sheets/guillain-barre-syndrome-fact-sheet. It ranges in severity from presenting mild symptoms with "brief weakness to nearly devastating paralysis, leaving the person unable to breathe independently." Id.

[3] All of the exhibits referenced herein were filed as attachments to the plaintiff's original Complaint initiating the Member Case, No. 3:21-cv-00535.

firm's intention to stay open and to keep providing services and paying its employees. It also stated: "[U]nderstandably, if you are concerned about continuing to work during this situation and wish to remain at home on an unpaid basis, you are welcome to do so." (Doc. No. 1-1, at 1.)[4]

One of Russo's co-workers, Lindzi Pipkin, lived with her boyfriend, Kyle. On Sunday, April 19, 2020, Kyle began experiencing symptoms consistent with those associated with COVID-19. Over the next two work days, Pipkin nonetheless reported to work in Moore Ingram's Brentwood office. During this time period, Pipkin began experiencing symptoms, including a sore throat, which she initially attributed to allergies. On Wednesday, April 22, 2020, Pipkin reported this information to Greg Fuller, the supervising attorney at Moore Ingram's Brentwood office, and told him that both she and her boyfriend were going to be tested for COVID-19. Pipkin also texted her co-workers, including Russo, to inform them that she and her boyfriend were being tested. (Doc. No. 17 ¶¶ 30–36; *see also* Doc. No. 1-2.)

The plaintiff was already at work on the morning of Wednesday, April 22, 2020, when she received Pipkin's message. Upon receiving the message, the plaintiff immediately left Moore Ingram's offices and returned home, "feeling that it was unsafe to be present at Defendant's office due to Ms. Pipkin's potential exposure, as well as the potential exposure of Plaintiff's co-workers . . . with whom Ms. Pipkin had worked the two preceding days while [she was] experiencing symptoms consistent with COVID-19 exposure." (Doc. No. 17 ¶ 37.) The plaintiff sent a text

---

[4] The plaintiff alleges, upon "information and belief," that the defendant's goal in sending the March 24, 2020 email was to

emphasize the importance of continuing in-person operations with only the minimal precautions suggested in the email, and to falsely suggest that the alternative to in-person operations would necessarily be employees being laid off without pay (rather than employees continuing to be paid and working remotely from home, as was occurring at numerous other comparable law firms throughout Tennessee and the country).

(Doc. No. 17 ¶ 27.)

explaining her abrupt departure to Jody Scott, the Office Manager for Moore Ingram's Brentwood

and Knoxville, Tennessee offices. The plaintiff explained that she had been "really stressed about

this and feel really uncomfortable now coming in especially since I[']m at a higher risk and think

I am going to take the day today." (Doc. No. 17 ¶ 40; *see also* Doc. No. 1-3.)

On Thursday, April 23, 2020, Jody Scott emailed Moore Ingram's Human Resources

Manager, Catherine Larkins, explaining Pipkin's situation and that she would be out the rest of the

week and "assum[ing]" that her time off would be "excused under FFCRA." (Doc. No. 17 ¶ 42.)[5]

Scott also described the plaintiff's decision to use paid time off ("PTO") until Pipkin received her

COVID test results as based on the plaintiff's "feel[ing that] she is at a higher risk as her father

has an auto-immune disease . . . . [S]he feels she may have inherited the disease and doesn't want

to take any chances. . . ." (*Id.*)

> Later the same day, Russo sent a text message to Jody Scott and Greg Fuller that stated:
>
> Hey guys! As you know I've been really stressed from everything with Covid-19
> and have been having some stomach issues due [to] all the anxiety. I talked to my
> dad's neurologist this morning who cautioned I should probably stay at home due
> to me being in a higher risk pool. I then spoke with another doctor this morning
> who agreed and is faxing over a note to the office to either stay at home or work
> remotely for at least a month. You know how much I value you guys and my job
> and if I can be accommodated working from home I would be super grateful. If not
> I understand but I think it's best for my physical and mental health to stay out until
> it is less of a risk.

(*Id.* ¶ 44; Doc. No. 1-5, at 1.) Scott forwarded the text via email to Fuller, Larkins, Lemons, and

Moore Ingram's Administrative Partner and "highest member of management" (Doc. No. 17 ¶ 1),

Bill Johnson. Scott described Russo as having "freaked out" over the news that Pipkin was being

tested for COVID-19 and explained that she was requesting leave for a month and sending a

---

[5] The plaintiff apparently intended to attach the email exchange between Scott and Larkins as Exhibit 4 to the original Complaint. Exhibit 4 actually appears to be an early draft of the Complaint, attached by mistake. (Doc. No. 1-4.)

doctor's note. (Doc. No. 17 ¶ 46; Doc. No. 1-6. at 2.) Scott indicated that she and Fuller needed input on how to deal with Russo's situation:

> At this point Greg and I would like guidance as to our next move. We are afraid we will lose 1 maybe 2 [legal assistants] due to this, but also Greg mentioned if we let them work from home will that be questioned as to why we didn't do this all along or can we allow just Julia [Russo] to work from home with the Doctors note for a month? Julia has 16 hours vacation PTO as of today to use.

(Doc. No. 1-6, at 2.)

Johnson replied curtly: "Not letting them work from home. Lets set call for 4." (Doc. No. 17 ¶ 49; Doc. No. 1-6, at 2.) The plaintiff alleges "upon information and belief" that a conference call took place that afternoon, during which Johnson "expressed hostility towards the idea of any legal assistant working from home, or receiving FMLA leave based on medical concerns regarding COVID-19 . . . and further expressed that Defendants should not, in his opinion, retain employees who would not continue working during the pandemic in essentially the same manner as they had before the pandemic." (Doc. No. 17 ¶ 51.)

On April 24, 2020, the plaintiff's doctor, Matthew Milligan, faxed a note to Moore Ingram that stated: "For medical reasons, please excuse the above named employee [identified on the form as Russo] from work" from "23 April – 23 May (ok to work from home if available)." (Doc. No. 1-7.) Jody Scott emailed Fuller and Larkins to notify them that she had received the doctor's excuse for Russo and that a telephone conference call with Russo was scheduled. Scott's suggestion was that they

> tell her we have the excuse, but she only has PTO through Monday, so on Tuesday she begins unpaid. If she would like to file for FMLA she will have to have the doctor fill out the forms and submit back to us then her job is guaranteed for 12 weeks as unpaid. If FMLA is not approved then her job is not guaranteed.

(Doc. No. 1-6, at 1.)

Around 4:00 p.m. on April 24, 2020, Greg Fuller and Jody Scott had the anticipated call with Russo to discuss her situation. According to notes taken by Scott during this meeting, she and Fuller notified Russo that she was covered by PTO through the end of that day and that she had the option of returning to work or seeking FMLA leave, which would require her to have her doctor fill out the requisite forms. (Doc. No. 1-9.) Scott's notes reflect that Fuller told the plaintiff that the current statistics related to the coronavirus indicated that it was less serious than the flu. (*Id.*)

On Monday, April 27, 2020, Scott sent an email to Fuller and Larkins to notify them that Russo "wants to try the FMLA route" and that Scott had faxed the necessary paperwork to Russo's doctor. (Doc. No. 1-11, at 1.) Scott added that she "seriously [didn't] know how [Russo] could qualify for FMLA." (*Id.*; Doc. No. 17 ¶ 77.)

The plaintiff's physician submitted the necessary form. (Doc. No. 1-12.) On the form, Dr. Milligan indicated that the plaintiff had "situational anxiety" and that "[h]er workplace does not protect her against Covid-19, and she has been denied work at home status. Given her family history of GB syndrome, this is ludicrous." (Doc. No. 1-12, at 2.) He identified her condition as having commenced on April 22, 2020 and its probable duration as "2–3 months." (*Id.*) He stated that she should be on leave through June 1, 2020. (*Id.*) The plaintiff specifically alleges that her "medical condition constituted a serious medical condition entitling [her] to FMLA leave." (Doc. No. 17 ¶ 83.) Moore Ingram never requested additional information or questioned whether medical leave was appropriate at that time for the plaintiff's medical condition. (*Id.* ¶ 84.) "To the contrary, Defendant concluded on or immediately after April 30, 2020 . . . that Plaintiff was entitled to FMLA leave as Plaintiff had requested." (*Id.* ¶ 85.)

Russo remained on FMLA leave as planned through the end of May 2020. However, on May 27, 2020, she sent a text to Scott stating that she had just seen her doctor and that "he feels

given the rise in cases and lack of accommodation, it is in [her] best interest medically to continue to stay on leave and not return June 1st." (Doc. No. 1-15, at 2.) Russo also asked Scott to fax the necessary paperwork for extending her FMLA leave to her doctor. Scott did so, and Dr. Milligan resubmitted FMLA paperwork for the plaintiff, again diagnosing "[s]ituational anxiety related to Coronavirus," this time with an expected duration of "3–6 months" and authorizing medical leave through July 2020. (Doc. No. 1-16, at 3.) As a result of this documentation, Moore Ingram concluded that Russo was entitled to continued FMLA leave as requested. (Doc. No. 17 ¶ 101.)

On July 8, 2020, Russo sent an email with the subject line "FMLA" to Scott and Fuller, in which she acknowledged that her "FMLA is set to expire next week on July 16, 2020."[6] (Doc. No. 17 ¶ 102; Doc. No. 1-17, at 3.) However, she also indicated that her doctor "still thinks it is within [her] best interest medically to once again tentatively extend my FMLA or to be accommodated to work from home given the surge in COVID-19 cases specifically in Tennessee." (Doc. No. 1-17, at 3.) She noted:

> He is still perplexed as to why I have not been accommodated, and quite honestly, I was not able to give him an explanation as I was also never given one. When I was still at the office, attorneys were rotating between working in the office and working at home. If they can be accommodated, shouldn't those same accommodations be made to all staff? Especially those who are at a higher risk? Given the American Disabilities Act, I do not understand why reasonable accommodations cannot be granted for me, given that my role and responsibilities can be achieved remotely. My full intent is, and always has been, to return to my position. My request is not arbitrary, but is medically documented and necessary. I

---

[6] In her Amended Complaint, the plaintiff asserts, in a footnote, that she was mistaken in her calculation as to when her twelve weeks of FMLA leave expired and that her mistake resulted from the defendant's failure to provide the notices required by 29 C.F.R. § 825.300. (Doc. No. 17, at 18 n.2.) In her pleading, she computes her leave time as follows:

> Plaintiff had paid time off through the end of the day on Monday, March 27, 2020. Her FMLA leave started thereafter. Accordingly, . . . her 12 weeks of FMLA leave would have begun on Tuesday March 28, 2020 and ended on Monday, July 20, 2020.

(*Id.*)

have an increased susceptibility to complications from Covid-19 as a result of a genetic predisposition and family medical complications.

(*Id.*; Doc. No. 17 ¶ 102.)

Fuller forwarded the plaintiff's email to Lemons, Larkins, Scott, and Johnson. (Doc. No. 1-17, at 2.) Johnson replied to all, stating: "Lets accom[mo]date her by firing her. Su[cep]tibility to covid is not a disability." (*Id.*) Larkins, the Human Resources Manager, emailed a response to Johnson and Lemons only, pointing out that the plaintiff's request for an accommodation under the ADA could be based on anxiety. Larkins also attached research on the ADA and COVID and noted that, while there was "tons of info" on the topic, she saw "nothing that states we are obligated to allow her to [work from home] indefinitely." (*Id.* at 1.)

Lemons responded, expressing his belief that the examples Larkins cited in her email applied to their situation, because, in his view, Russo was "asking for an accommodation based upon a perceived potential exposure" to COVID, which presented an "undue hardship" for Moore Ingram, because "we did not hire her as a remote employee, with the known limitations on what they could do, but as one working 'in the office' performing certain tasks that cannot be performed remotely." (*Id.*) However, he also agreed with Larkins that the stated basis provided by Russo's doctor for FMLA certification was "situational anxiety." (*Id.*) Johnson replied tersely: "Think my suggestion is the best." (*Id.*) And Lemons then asked, "On the 16th if she doesn't return, it's all moot . . . right?" (*Id.*)

Russo asserts that, as of the day that Johnson suggested that they "accommodate" her by "firing her," she was on FMLA leave and entitled to return to work at the conclusion of her leave. She claims that Larkins, Lemons, Fuller, and Scott nonetheless all decided to "acquiesce" to

Mr. Johnson's illegal plan and to permit Defendant to illegally terminate Plaintiff; each viewed his or her task thereafter as to attempt to '"paper over" Mr. Johnson's illegal plan with documents suggesting that Defendant sought to determine its obligations under, and comply with, the FMLA and ADA, when they each instead

knew that the actual plan was to terminate Plaintiff in retaliation for having asserted rights under the FMLA and ADA, as Mr. Johnson had demanded.

(Doc. No. 17 ¶ 109.) She also asserts that Larkins knew "as soon as she reviewed Mr. Johnson's email . . . that Mr. Johnson's suggestion indicated that . . . Mr. Johnson intended to have Defendant retaliate against Plaintiff for exercising her legal rights, including her right to use FMLA leave." (Doc. No. 17 ¶ 113.)[7]

In a separate email thread, dated July 8 and 9, 2020, Tony Lemons responded to Fuller's email forwarding the plaintiff's renewed request to extend her FMLA leave by asking whether the plaintiff had the ability to extend her FMLA leave further, as her twelve weeks expired on July 16. (Doc. No. 1-18, at 2.) Greg Fuller responded that, in his opinion, allowing Russo to work from home would impose an undue burden on the firm, as there were numerous tasks for which she was responsible that she could not perform remotely, including faxing, answering phones, and picking up mail, in addition to "IT issues." (Doc. No 1-18, at 1.) He also noted that he "want[ed] to make sure we handle properly," and he "assume[d] that would involve some sort of interactive process." (*Id.*) He had not seen the latest doctor's note supporting the plaintiff's request for additional leave and believed it would be relevant to their consideration of Russo's request for leave beyond July 16. His belief was that a request for an "indefinite restriction" would be unreasonable. (*Id.*)

---

[7] The plaintiff speculates that the reason Larkins responded just to Lemons and Johnson after Johnson's suggestion that the firm accommodate the plaintiff by firing her was because:

(A) she knew that Mr. Johnson had suggested that Defendant take illegal action against Plaintiff in suggesting that Defendant "accom[mo]date [Plaintiff] by firing her," (B) she did not intend to take action to prevent Mr. Johnson from causing Defendant to take illegal action against Plaintiff and (C) she wanted to limit the number of persons who would be able to see her response to Mr. Johnson because the response acquiesced to the inappropriate suggestion by Mr. Johnson by failing to note that it was inappropriate.

(Doc. No. 17 ¶ 120.)

Moore Ingram's management engaged in additional email discussions about Russo's situation on July 13 to 14, 2020. On July 13, Larkins emailed Scott, Lemons, Johnson, and Fuller, stating that she had discussed Russo's situation with "Anna" and "Jeff" (who are not identified further) and wanted to make sure that they had "all [their] ducks in a row on this one." (Doc. No. 1-19, at 3.) Larkins briefly outlined the history of Russo's leave requests, noting in particular that her twelve weeks of FMLA leave expired on July 16, so she was supposed to be back in the office on July 17, 2020. (*Id.*) Anna and Jeff had asked whether the firm had applied the FFCRA to any of Russo's leave time. Larkins' recollection was that Russo had "never fit into any of the guidelines, she simply took FMLA because she's been afraid of getting COVID," but Anna advised her to verify whether Russo was eligible. (*Id.*) However, Anna and Jeff both agreed that Russo's "request to extend her leave is an undue hardship and her request to work from home is an undue hardship," particularly because both requests were "indefinite." (*Id.*) As a result of this conversation with Anna and Jeff, Larkins recommended that, if everyone agreed, Fuller should contact Russo to "let her know we can't accommodate[] her requests," either to work from home or to extend her leave, but that Fuller's communication should be forwarded to Bill Johnson for approval first. (*Id.*) In addition, the firm needed to decide whether Russo was entitled to "FFCRA time." (*Id.*)

Jody Scott replied to all the next morning, July 14, to confirm that Russo's full twelve weeks of FMLA leave ran through July 16, 2020. She also reattached Russo's doctor's paperwork supporting both of the plaintiff's requests for leave and quoted from it the doctor's observation that it was "ludicrous" that Russo was not being permitted to work from home in light of her family history of GBS. (Doc. No. 19-1, at 2.) Parenthetically, Scott added that GBS "probably would qualify for FFCRA," even though situational anxiety alone probably would not qualify. (*Id.*) Scott

quoted from an online source providing information about FFCRA coverage, which indicated that when "[a]n employee has a suppressed immunity, which puts them at a higher risk of mortality" and has "a qualifying medical certification of this condition," the employee would likely qualify for up to 80 hours of paid sick leave under the FFCRA. (Doc. No. 19-1, at 2 (quoting https://www.onedigital.com/blog/when-an-employee-refuses-to-work-during-the-covid-19-pandemic/).)

Also on July 13, the plaintiff sent a follow-up email to Jody Scott and Greg Fuller, incorporating her email of July 8 requesting an extension of her leave time beyond July 16, with regard to which she had not yet received any response. (Doc. No. 20-1, at 2–3.) Fuller drafted a response, which he sent to Bill Johnson for his approval, with a copy to the other management team members. This draft, which was apparently never sent to Russo, stated in relevant part:

> In order to fully evaluate the situation, we will need documentation from your physician. Please forward that documentation as we do not have any current paperwork. With regard to your statements below, we have previously discussed the IT issues with working remotely. The desktops are not set up for securely doing so. In addition, from a physical standpoint you would not be able to fax or scan documents. You would not be able to print large documents or organize binders. You would not be able to mail documents using our postage meter, nor would you be able to answer the phones. This would create more work for the other assistants in carrying out your daily responsibilities. With respect to the attorneys rotating, they are physically present in the office multiple days each week and most are here every day. The attorneys are provided laptops that are designed to be used remotely as they travel all across the state doing their regular work activities.
>
> In light of the above, allowing you to work remotely would create a hardship for the firm and your co-workers. We hope to have you back in the office where we have ample space, as we could use your help but unfortunately at this time, we cannot make the accommodations that you have requested.

(Doc. No. 20-1, at 2.)

Tony Lemons interjected to ask why they needed additional documentation from Russo's physician if they were denying her request for accommodations and she had already used her twelve weeks of FMLA leave. Fuller responded that he "wanted to establish that she has not even

provided the necessary paperwork to conduct the interactive process," and, in addition, if her request was "indeed for indefinite accommodations, then it will only strengthen our case." (Doc. No. 1-20, at 1.) Lemons responded with further recommendations to modify the communication to Russo while also noting that he would "defer to" Johnson, as he was "the one who 'counts the most.'" (*Id.*) In handwriting across the top of this communication appear the words: "Extend FMLA 30 days. We are not going to hold your job." (*Id.*) The plaintiff states "upon information and belief"—without explaining the source of such information or belief—that these words were handwritten on a printed version of the email on "July 13, 14, or 15" by either Tony Lemons or Bill Johnson. (Doc. No. 17 ¶¶ 135–37.)

On July 15, Bill Johnson sent the plaintiff an email stating:

Greg [Fuller] and Jody [Scott] have made me aware of your FMLA coming to an end as well as your request to either extend your FMLA or be approved to work from home. We will extend your FMLA for 30 days, through August 16th. I do need to note that we are not required to hold your job after July 16th. If a position is available after this date and you are ready to return on site and work in the office, we will consider you for any openings we may have at that time.

Working remotely causes undue hardship for the firm. A legal assistant's position simply can't be done 100% remotely without causing additional hardship to the firm and your co-workers.

(Doc. No. 1-21, at 4.)

The plaintiff responded with a lengthy email to Johnson on July 16. Initially, she requested clarification regarding Johnson's statement that the firm would grant an extension of her FMLA leave through August 16 while also stating that the firm would not hold her job through that date but, instead, would consider her for any openings it might have as of the date she sought to return to the office:

I wish to receive clarity with regards to this statement. Especially, because you are essentially informing me of your intent to terminate my position due to your inability to reasonably accommodate my ability to perform all of the duties of my position, remotely. Since, you have consistently met this request with a denial,

according to FMLA & ADA, I am entitled to a return to either my position or another equivalent position. Your statement makes my 'return' only possible contingent on a potential vacancy.

(Doc. No. 1-21, at 2.)

The plaintiff also explained her position regarding the firm's unreasonableness in not allowing her to work from home and not offering any alternative accommodation for her concerns about COVID:

The unwillingness to create any accommodation whatsoever for me, in the midst of a global pandemic, is something I would also appreciation some explanation or clarity. Despite a medical directive to allow me to telework, was any accommodation offered? A distant cubicle? A private office? PPE throughout the office? . . . .

You stated "undue hardship." How is the potential to work remotely a hardship for the firm? That has never been explained to me. Furthermore, no alternate accommodation has ever been suggested or provided to me. I have inquired several times . . . as to why I could not be reasonably accommodated when the CSC & WHO were urging & encouraging ALL workplaces to accommodate the needs of their employees remotely with the exception of essential workers in specific professional roles. . . .

No concrete reasons were ever given; just a hard and steadfast, no. . . . The Brentwood office . . . never required or maintained any of the CDC guidelines for a safe and healthy environment during a public health emergency. No masks, no ventilation . . . , no gloves. Nothing. Business as usual. . . .

The accommodation I was seeking was simple[:] telework. . . .What is burdensome, is the fact that attorneys were able to work from home and not staff[.]. . . [W]hy are only certain staff members accommodated and not others?

(Doc. No. 1-21, at 3.)

Johnson replied on July 22, 2020 with his own lengthy email, in which he purported to clarify his July 15 email but arguably muddied the waters further instead:

I want to start by clarifying my prior email . . . in which I addressed your FMLA leave extension. As you are aware, your FMLA leave expired as of July 16, 2020. However, we are allowing you an additional period of leave in which your leave will now extend through August 16, 2020.[8] Under FMLA and our firm policy, you

---

[8] August 16, 2020 fell on a Sunday.

are required to provide proof (i.e. a medical certification) of your ability to return to work at the end of your FMLA leave. In other words, you should have provided [Moore Ingram] a medical certification certifying that you are fit to return to work on or about July 16, 2020. Since you did not do so, we are not required to hold your position open for you in the event we need to hire a legal assistant to do your work in your stead. If you do provide a doctor's note certifying that you are ready and able to return to work by August 16, 2020 (i.e. after your month of extended leave), we will consider you for any openings the firm has at that time. To be clear, you were not terminated effective July 16, 2020 nor has any decision been made to terminate you. Rather, we are trying to allow you time to address your anxiety, as well as procure an authorization from your doctor.

(Doc. No. 1-21, at 1.)

Johnson also stated that, while the firm was "sympathetic" regarding the plaintiff's family history of GBS, "a family history of an illness which does not yet present itself in you is not a disability under the ADA, FMLA, or FFCRA." (Doc. No. 1-21, at 1.) With respect to the plaintiff's request for an accommodation for her COVID-related anxiety, Johnson characterized the plaintiff as

essentially seeking indefinite leave for an unknown time period . . . . Requests for leave that are indeterminate and indefinite in nature are not deemed reasonable under the ADA. In addition, allowing you to work from home indefinitely also imposes an undue hardship on the firm. No other legal assistant is, or has been, working fully remotely in the COVID-19 pandemic. Why? Because there are many responsibilities that cannot be accomplished when you are at home.

(*Id.*) Johnson went on to enumerate those responsibilities and concluded: "Frankly, you have been given the most accommodation of any legal assistant in this COVID-19 era, and you have also caused the most discourse and turmoil." (*Id.*)

Johnson addressed the plaintiff's assertions that the firm had not taken any precautions against the spread of the virus, noting that there had only been one positive COVID test in all seven Moore Ingram offices since the start of the pandemic. (*Id.*) He also noted that the plaintiff would be able to wear a mask while at work if she chose upon her return and that, if she requested a "distanced cubicle," then the firm "would be happy to consider that as a potential accommodation"

if she provided a doctor's note certifying that she was "ready and able to return to work (i.e. ha[d] been treated for [her] anxiety)." (*Id.*)

The plaintiff alleges "[u]pon information and belief" that "Mr. Johnson and Defendant intended at the time of sending Mr. Johnson's July 15, 2020 email to consider Plaintiff on and after July 17, 2020 as no longer an employee of Defendant, but instead as only a person who could apply for a position, if one was available." (Doc. No. 17 ¶ 144.) The plaintiff did not return to work at Moore Ingram's offices on July 17, 2020. (Doc. No. 17 ¶ 148.) She alleges, therefore, that the defendant considered her employment terminated as of that date. (Doc. No. 17 ¶ 150.) She also asserts that she believed herself to have been terminated effective July 17, 2020, based on the language of Johnson's email to her, and that the defendant itself also "believed that Plaintiff herself believed that Plaintiff's employment with Defendant was terminated." (Doc. No. 17 ¶ 154.) The plaintiff does not allege that she would have been able to return to work at the defendant's Brentwood office on July 17 without accommodations.

Russo also did not return to work on Monday, August 17, 2020. She alleges that she attempted to communicate with the defendant on August 17, 2020 by calling Jody Scott. Scott did not answer the plaintiff's call, but Russo left a voice mail asking Scott to return her call to "discuss Plaintiff's employment." (Doc. No. 17 ¶ 169.) The plaintiff claims that Scott received the message but pretended that she had not and, in any event, did not return the call. Nor did anyone else from Moore Ingram attempt to contact the plaintiff on August 17 to inquire about her intention to return to work. (*Id.* ¶¶ 170–71.)

On Tuesday, August 18, Scott, on behalf of Moore Ingram, sent the plaintiff an email stating: "Since you did not return to work yesterday as we anticipated, I have attached a State of Tennessee Notice of Separation to finalize the employee/employer relationship." (Doc. No. 17 ¶

172; *see also* Doc. Nos. 1-22 (email) and 1-23 (Notice of Separation).) The reason stated on the Notice of Separation was "Quit," and the explanation provided was: "Employee didn't return to work." (Doc. No. 1-23.)

Russo alleges, in the alternative, that she was "terminated by Defendant on August 17, 2020." (Doc. No. 17 ¶ 153.) She further alleges "[u]pon information and belief" that the defendant had no intention to rehire her even if she had returned to the office on August 17 and that, instead, it would have claimed to have no open positions available or that any medical proof the plaintiff provided to certify her ability to return to work was insufficient. (Doc. No. 17 ¶ 160.)

The plaintiff filed suit on July 15, 2021. Although the case was originally assigned to Judge Richardson, it was reassigned to the undersigned as related to the Lead Case, filed by the plaintiff in September 2020, asserting claims under the Fair Labor Standards Act. Following the filing of a Motion to Dismiss in October 2021, the plaintiff filed the Amended Complaint, which asserts, as noted above, eleven separate claims: (1) termination in retaliation for asserting ADA rights; (2) violation of the ADA by failing to engage in the interactive process; (3) violation of the ADA by failing to provide a reasonable accommodation; (4) violation of the ADA by terminating the plaintiff based on her disability; (5) violation of the ADA by terminating plaintiff based on her perceived disability; (6) termination in retaliation for asserting FMLA rights; (7) FMLA interference; (8) violation of the FFCRA; (9) termination in violation of the TDA based on the plaintiff's disability; (10) termination in violation of the TDA based on the plaintiff's perceived disability; and (11) termination in violation of the TPPA.

Following the filing of the Amended Complaint, by agreement of the parties, the Member Case, No. 3:21-cv-00535, was consolidated with the Lead Case, No. 3:20-cv-00820, and all filings

after October 22, 2021 (including the Motion to Dismiss and all related filings), were docketed in the Lead Case.

The defendant thereafter filed its Motion to Dismiss the Amended Complaint and supporting Memorandum of Law, seeking dismissal of the Amended Complaint in its entirety. (Lead Case, Doc. Nos. 48, 49.) The plaintiff filed a Response in opposition (Lead Case, Doc. No. 42), and the defendant filed a Reply (Lead Case, Doc. No. 55.)

## III.  DISCUSSION

### A.  ADA Claims

The plaintiff asserts five separate claims under the ADA, and the defendant seeks dismissal of each of them under Rule 12(b)(6).

#### 1.  *ADA Discrimination—Counts III, IV and V*

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to," among other things, "discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In addition, the definition of "discrimination" under the ADA encompasses an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or an employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]."*Id.* § 12112(b)(5)(A).

To prove a claim of discrimination in violation of the ADA, a plaintiff must establish that "(1) she has a disability; (2) she was qualified for the job; and (3) she either was denied a reasonable accommodation for her disability or was subject to an adverse employment decision that was made solely because of her disability." *Dumas v. Hurley Med. Ctr.*, 837 F. Supp. 2d 655, 665 (E.D. Mich.

2011) (quoting *Roush v. Weastec, Inc*., 96 F.3d 840, 843 (6th Cir. 1996)); *see also Chaniott v. DCI Donor Servs., Inc.*, 481 F. Supp. 3d 712, 721 (M.D. Tenn. 2020).

The existence of a "disability" is, then, a threshold element of any ADA discrimination claim. The ADA defines "disability" as:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment[.]

42 U.S.C. § 12102(1). The ADA instructs courts to construe the definition of disability "in favor of broad coverage of individuals." *Id.* § 12102(4)(A).

Counts III, IV, and V of the Amended Complaint all assert different versions of a claim for discrimination in violation of the ADA. Count III is based on the defendant's alleged failure to provide a reasonable accommodation for a disability; Count IV asserts that the plaintiff was terminated because of her having an actual impairment under 42 U.S.C. § 12102(1)(A); and Count V asserts that the plaintiff was terminated because the defendant "regarded" her as having an impairment, under § 12102(1)(C).

The defendant seeks dismissal of all of these claims based on its arguments that: (1) the Amended Complaint fails to allege facts showing that the plaintiff is actually disabled as defined by the ADA or that the defendant "regarded" the plaintiff as disabled; (2) the plaintiff was not "otherwise qualified" to perform the essential functions of her job as a legal assistant for Moore Ingram; (3) the plaintiff's requested accommodation—that she be permitted to work from home indefinitely—was unreasonable as a matter of law; and (4) the Amended Complaint does not allege facts showing that the plaintiff was terminated *solely* because of an actual or perceived disability.

a)    *The Plaintiff's Alleged Impairment*

The defendant argues that "anxiety related to fear of contracting COVID-19" is not a disability "as a matter of law based on Plaintiff's own allegations." (Doc. No. 49, at 10.) The defendant asserts that anxiety, to be disabling, must interfere with a major life activity and that the plaintiff's mere preference for working from home does not establish that her anxiety substantially limited her ability to work or any other major life activity. The defendant also maintains that the ADA does not apply to "transitory impairments" (Doc. No. 49, at 12 (citing 42 U.S.C. § 12102(3)(B)) and that the plaintiff's doctor in this case did not indicate that her anxiety was expected to have a duration of more than six months.

This latter argument is simply incorrect, at least with respect to a determination of whether a plaintiff has an actual "impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). The ADA dictates that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C.A. § 12102(4)(D). In addition, the ADA regulations expressly provide that the "effects of an impairment lasting or expected to last fewer than six months can be substantially limiting" for purposes of proving an actual disability. 29 C.F.R. § 1630.2(j)(1)(ix). The provision the defendant cites, 42 U.S.C. § 12102(3)(B), states: "Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less." Paragraph (1)(C) is the form of "disability" under the act defined as "being regarded as having such an impairment." *Id.* § 12102(1)(C). It is not relevant when a plaintiff alleges that she has an actual impairment and is disabled under § 12102(1)(A).

In addition, the cases cited by the defendant in support of its argument that the plaintiff's "preference" to work from home does not qualify as a disability either provide no actual support for that assertion, were issued prior to the January 1, 2009 effective date of the ADA Amendments

Act of 2008 ("ADAAA"), Pub. L. No. 110–325, § 8, 122 Stat. 3553, or were decided on summary judgment rather than on a motion to dismiss. As such, they have essentially no bearing on this case. Moreover, the plaintiff has not alleged that she simply preferred to work from home. Rather, she alleges that, "[u]pon the advent of the COVID-19 pandemic, [she] began suffering from severe anxiety related to being potentially exposed to COVID-19," in particular because she has a family history of GBS, which puts her "particularly at risk of death or serious illness if she contracted COVID-19." (Doc. No. 17 ¶ 15.) Her doctor diagnosed her as having situational anxiety and, further, that it was "ludicrous" that Moore Ingram would not authorize her to work from home in light of her family history of GBS. (Doc. No. 1-12, at 2.) Although he initially authorized the plaintiff to be off work related to her condition for approximately six weeks, he later extended that time frame and noted his expectation that the duration of her condition was "3–6 months." (Doc. No. 1-16, at 2–3.) The plaintiff has adequately alleged that she suffered from a severe impairment.

As for the defendant's argument that the activities identified by the plaintiff do not qualify as "major life activities," the court finds that this question, like the question of whether the plaintiff suffered from a sufficiently severe impairment, is more appropriately reserved for the summary judgment stage. The plaintiff clearly alleges that her severe anxiety about contracting COVID-19 "substantially limited major life activities, including working out[side] of the home, visiting stores and other venues where other people may be physically present, and interacting with other people in-person." (Doc. No 17 ¶ 16.) The ADA provides the following non-exhaustive list of "major life activities": "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(i)(1)(i). The regulations make it clear that "the term 'major' [must] not be interpreted strictly to create a

demanding standard for disability." 29 C.F.R. § 1630.2(i)(2). Moreover, "[t]he term 'substantially limits' [must] be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard." *Id.* § 1630.2(j)(1)(i). Thus,

> [a]n impairment is a disability [for purposes of 42 U.S.C. § 12102(1)(A)] if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.

*Id.* § 1630.2(j)(1)(ii). And finally, the focus of attention in an ADA case should be on "whether covered entities have complied with their obligations" rather than on "whether an individual's impairment substantially limits a major life activity." *Id.* § 1630.2(j)(1)(iii).

At this point in the proceedings, the court accepts as true the plaintiff's allegations that she had severe anxiety, diagnosed by a physician; that this impairment substantially limited her ability to work outside the home or, indeed, to conduct any activity that brought her into contact with others; and that these activities qualify as major life activities for purposes of the ADA. She has adequately alleged that she was disabled under the first prong of § 42 U.S.C. § 12102(1).

### b)    *"Regarded As" Disabled*

Before the implementation of ADAAA, the Supreme Court interpreted the ADA to mean that a person was disabled under the "regarded as" prong "only if a covered entity *mistakenly believed* that the individual had a physical impairment that was substantially limiting, or *mistakenly believed* that an actual, nonlimiting impairment was substantially limiting." *Neely v. Benchmark Family Servs.*, 640 F. App'x 429, 435–36 (6th Cir. 2016) (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999), *overturned by* U.S. Pub. L. 110–325 (2009)) (emphasis added). In passing the ADAAA, however, Congress liberalized the standard, redefining "regarded as having an impairment" to require only that a defendant took a prohibited action based on a

perceived impairment, regardless of whether the employer thought the impairment was substantially limiting. *Id.*; 42 U.S.C. § 12102(3)(A).

Citing a Sixth Circuit case that predates the ADAAA, the defendant argues that the plaintiff's "regarded as" claim must be dismissed, because such a claim requires a showing that the employer "entertains a misperception about the employee." (Doc. No. 49, at 12 (citing *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008)). The ADA, as amended, no longer requires some type of misperception, however, and it apparently contemplates that an employee can be both actually disabled and regarded as disabled under the statute. In addition, while the "regarded as" prong does not apply to "impairments that are transitory and minor," 42 U.S.C. § 12102(3)(B), internal communications among the defendant's managers indicate that they expected that the plaintiff's COVID-related anxiety could be "permanent." (Doc. No. 1-18, at 2.)

The defendant also points to the exhibits attached to the plaintiff's pleading, which indicate that at least some of the defendant's agents regarded the plaintiff's anxiety as minor and not the type of condition that would qualify her for FMLA leave or, by extension, a claim of disability under the ADA. (*See, e.g.*, Doc. Nos. 1-11, 1-17.) Other agents of the defendant, however, pointed out to their colleagues that the plaintiff had actually been diagnosed with situational anxiety, which could qualify as a disability and, moreover, as noted above, that the condition might not be short-term and transitory, since it was unclear, particularly in the summer of 2020, how long COVID would remain a national crisis.

The court finds that the plaintiff has adequately pleaded facts that, if true, would establish disability under the "regarded as" prong as well.

> c)  *"Otherwise Qualified" and Reasonable Accommodation*

The defendant argues that "Plaintiff was not otherwise qualified for the job because regular, in-person attendance was an essential job function of Moore Ingram legal assistants and Plaintiff

could not, by her own admission," meet that requirement. (Doc. No. 49, at 15.) The defendant supports its claim that in-person attendance was an essential job function by referencing the exhibits attached to the plaintiff's pleading that "clearly state that in-person attendance was an essential function of Plaintiff's job as a legal assistant for Moore Ingram." (Doc. No. 49, at 13 (citing Doc. Nos. 1-17, -18, -20, -21).) By the same token, it argues that the plaintiff's requested accommodation—to work from home—was unreasonable as a matter of law, because it would have required elimination of an essential job function. (*Id.* at 13–14 (citing, *e.g.*, *O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605, 617 (6th Cir. 2020) (finding plaintiff's anxiety disorder substantially limited her ability in speaking, which was an essential function of her job, so she was not qualified for the job, and her ADA claim against her employer failed)).)

As set forth above, however, just because the plaintiff has submitted exhibits in which the defendant's agents state that in-person attendance is an essential job requirement does not mean that the court must accept such statements as true for purposes of the defendant's Motion to Dismiss. Rather, the court accepts as true only that the defendant's various agents expressed the belief that in-person attendance was an essential job function. *Accord Jones v. City of Cincinnati*, 521 F.3d 555, 561 (6th Cir. 2008). The plaintiff clearly contests that assertion, both in her response emails to the defendant's agents and in the Amended Complaint. According to the plaintiff, she could perform all of her essential job functions remotely. The question of what functions are "essential" is a question of fact that the court resolves, on the defendant's Motion to Dismiss, in the plaintiff's favor. Whether the actual facts as ultimately developed in discovery will support this claim remains to be seen, but dismissal at this juncture is not warranted. *See Rorrer v. City of Stow*, 743 F.3d 1025, 1042 (6th Cir. 2014) (finding a material factual dispute as to what constituted the essential functions of the plaintiff's job and stating: "federal courts are not required to give

deference to [the employer's] judgment regarding what the essential functions of the position [are] when the record suggests that there is a genuine dispute of material fact on the issue. The ADA states that the court should give 'consideration' to the employer's determination, not 'deference' . . . . The employer's determination about what functions are essential is certainly given weight, but it is one of seven factors the court should consider, including '[t]he amount of time spent on the job performing the function' and '[t]he consequences of not requiring the [employee] to perform the function.'" (quoting 29 C.F.R. § 1630.2(n)(3)(iii); some internal quotation marks and citations omitted)).

The plaintiff has adequately alleged both that she was qualified for her job and that her requested accommodation of working from home was reasonable.

### d) Causation

The defendant argues that the plaintiff has not shown that she was disabled or regarded as disabled by Moore Ingram, that her requested accommodation was unreasonable, that the ADA did not require Moore Ingram to offer the plaintiff "indefinite leave," and that she was terminated only because she failed to return to work after the expiration of her extended leave period. (Doc. No. 49, at 16.) That conclusion, however, requires viewing the facts in the light most favorable to the defendant rather than to Russo. As set forth above, the plaintiff has adequately alleged that she was disabled and/or regarded as disabled and that she suffered an adverse employment action when the defendant terminated her rather than accommodating her request to work from home. The plaintiff alleges her requested accommodation was reasonable, because she could have performed all of her essential job functions from home. Viewed in the light most favorable to the plaintiff, the facts as alleged in the Amended Complaint establish that the plaintiff was fired because of her disability and the firm's unwillingness to provide a reasonable accommodation therefor.

The defendant's Motion to Dismiss will, therefore, be denied, insofar as it seeks dismissal of Counts III, IV, and V of the Amended Complaint.

### 2. Count II – Failure to Engage in Interactive Process

The defendant's argument for the dismissal of Count II of the Amended Complaint essentially hinges on its assertion that the plaintiff was unqualified for her position and that her request to work from home was unreasonable. (*See* Doc. No. 49, at 18 ("Failure to engage in the interactive process can only be an independent violation of the ADA if a plaintiff establishes a *prima facie* showing that she proposed a reasonable accommodation. Here, Plaintiff did not." (internal citations omitted)).) That argument dissolves in light of the court's determination that the Amended Complaint adequately alleges both that the plaintiff was qualified for her position and that her requested accommodation was reasonable. The defendant is not entitled to dismissal of this claim.

### 3. Count I – ADA Retaliation

The ADA provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Requesting an accommodation because of a disability is protected activity under the ADA. *Rorrer*, 743 F.3d at 1047. A retaliation claim may proceed even if the underlying ADA discrimination claim ultimately fails on the merits—for instance, if the plaintiff is unable to prove that she was disabled under the statute. *Neely v. Benchmark Family Servs.*, 640 F. App'x 429, 437 (6th Cir. 2016) (citing *Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007)); *see also Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 759 (3d Cir. 2004) ("Unlike a claim for discrimination under the ADA, an

ADA retaliation claim based upon an employee having requested an accommodation does not require that a plaintiff show that he or she is 'disabled' within the meaning of the ADA.")).

The plaintiff here alleges that she requested an accommodation for her disability and that she suffered an adverse employment action because of that request. She points to evidence supporting a causal connection between her request and her termination, including Bill Johnson's email to other management team members, in response to the plaintiff's request for an accommodation: "Lets accom[mo]date her by firing her. Sus[cep]tibility to covid is not a disability." (Doc. No. 1-17, at 2.)

The defendant argues only that Russo's allegations fail to establish "but for" causation and that she cannot show that the defendant's proffered reason for her termination is pretextual. This argument is misplaced, because the *McDonnell Douglas* burden shifting framework, which requires the plaintiff first to establish a *prima facie* case of retaliation (or discrimination) and then to rebut the defendant's proffered reason for an adverse employment action, does not come into play at all in the context of considering a Rule 12(b)(6) motion to dismiss. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002) ("The *prima facie* case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement."); *Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir. 2012) ("The district court's requirement that Keys's complaint establish a *prima facie* case under *McDonnell Douglas* and its progeny is contrary to Supreme Court and Sixth Circuit precedent.").[9]

---

[9] For her part, Russo is equally mistaken in asserting that Bill Johnson's suggestion that the firm accommodate her by firing her constitutes direct evidence of either retaliation or discrimination. "[D]irect evidence is evidence which, if believed, 'requires the conclusion that unlawful discrimination was at least a motivating factor.'" *Bartlik v. U.S. Dep't of Labor*, 73 F.3d 100, 103 n.5 (6th Cir. 1996) (quoting *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1248 (6th Cir. 1995)). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was

The Amended Complaint contains adequate factual allegations that, if true, would permit a reasonable jury to conclude that the plaintiff was terminated because she requested an accommodation for a disability. The defendant has not shown that it is entitled to dismissal of this claim under Rule 12(b)(6).

### B. TDA Claims

The plaintiff asserts claims under the Tennessee Disability Act based on an actual impairment (Count IX) and a perceived disability (Count X). The TDA prohibits private employers from discriminating against employees "based solely upon any physical, mental or visual disability of the applicant, unless such disability to some degree prevents the applicant from performing the duties required by the employment sought or impairs the performance of the work involved." Tenn. Code Ann. § 8-50-103(b). It is generally accepted that TDA claims are evaluated under the same standards that apply to ADA claims. *See, e.g.*, *Cardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367, 370 n.2 (6th Cir. 2013) ("A claim brought under the THA [Tennessee Handicap Act, now known as the TDA] is analyzed under the same principles as those utilized for the Americans with Disabilities Act." (quoting *Sasser v. Quebecor Printing (USA) Corp.*, 159 S.W.3d 579, 584 (Tenn. Ct. App. 2004)).

---

motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). When there is direct evidence, "the existence of unlawful discrimination is 'patent.'" *Id.* On the other hand, "[w]hatever the strength of the evidence, it is not 'direct' evidence if [it] admits more than one plausible interpretation, and requires a significant inference or presumption on the part of the trier of fact." *Kocak v. Cmty, Health Partners of Ohio, Inc.*, 400 F.3d 466, 470 (6th Cir. 2005) (quoting *Norbuta v. Loctite Corp.*, 1 F. App'x 305, 313 (6th Cir. 2001)).

In this instance, a jury may readily believe—based on the documentary evidence—that Bill Johnson made the referenced statement but nonetheless reasonably conclude, based on the totality of the evidence (whatever it may turn out to be), that the plaintiff was not terminated because of her disability or because she requested an accommodation. That is, drawing the conclusion that the plaintiff was actually fired because she requested an accommodation requires the factfinder to draw additional inferences.

However, the TDA differs from the ADA in one critical respect. Unlike the ADA, the TDA does not impose a duty on employers to make reasonable accommodations for a disabled employee. *Bennett v. Nissan N. Am., Inc.*, 315 S.W.3d 832, 841–42 (Tenn. Ct. App. 2009). Thus, under the TDA, "an employer will not be considered to have unlawfully discriminated against an individual with a disability if the individual's disability 'to some degree prevents the applicant from performing the duties required by the employment sought or impairs the performance of the work involved.'" *Id.* at 852 (quoting Tenn. Code Ann. § 8-50-103(b)).

The defendant argues that the plaintiff's TDA discrimination claims must be dismissed for the same reasons as those asserted in support of dismissal of the ADA claims—that the plaintiff was not disabled or perceived as disabled and was not qualified for her job. In addition, it argues that, as a matter of law, because the plaintiff admittedly could not perform her job without an accommodation either in the form of additional leave or being permitted to work from home, and the TDA does not incorporate an accommodation requirement, the plaintiff cannot state a viable claim under the TDA. (Doc. No. 49, at 28–29 (citing *Oliver v. Titlemax*, 149 F. Supp. 3d 857, 862 (E.D. Tenn. 2016); *Jones v. Sharp Elecs. Corp.*, No. W2013-01817-COA-R3CV, 2014 WL 806131, at *3 (Tenn. Ct. App. Feb. 28, 2014)).)

In response, the plaintiff insists only that her TDA claims "are subject to essentially the same analysis as is discussed above with respect to the equivalent ADA claims." (Doc. No. 52, at 23.) She acknowledges that the TDA does not incorporate an accommodation requirement but asserts that she has not attempted to state a TDA claim based on a failure to accommodate. (*Id.* at 23 n.46.) The court finds it impossible to reconcile this assertion. The plaintiff does not allege that she could have performed her job without accommodations. Instead, she alleges that the defendant terminated her rather than allowing a reasonable accommodation.

This case is not dissimilar from those cited by the defendant. In *Jones*, the plaintiff took FMLA leave for depression. 2014 WL 806131, at *1. After the plaintiff exhausted her twelve weeks of FMLA leave, her doctor advised her to take another month of leave before returning to work. *Id.* The defendant employer did not approve any additional leave and instead terminated the plaintiff when she failed to return to work upon the exhaustion of her FMLA leave. *Id.* The plaintiff filed suit, including a claim under the TDA that the employer failed to provide her a reasonable accommodation in the form of an additional leave of absence beyond what the FMLA provided. *Id.* at *2. The trial court granted summary judgment to the employer on the TDA claim, and the plaintiff appealed, arguing that a reasonable jury could have concluded that her termination was motivated by her disability rather than by her inability to perform her work without additional leave. *Id.* at *4. The appellate court nonetheless affirmed, based on the undisputed fact that the plaintiff was unable to return to work when her leave expired and, therefore, was not qualified for her job without an accommodation. *Id.* at *4.

Similarly, in *Oliver*, the district court granted the defendant's Rule 12(b)(6) motion to dismiss the plaintiff's TDA claim, where the plaintiff alleged in her complaint that she was terminated "when her leave expired and she was yet unable to return to work under normal workload and conditions." *Oliver*, 149 F. Supp. 3d at 866. Because there was no dispute that the "plaintiff's disability impaired her from performing her normal job's duties," the court found that the "defendant did not discriminate against plaintiff's disability by terminating her as a result of her inability to return to her normal workload." *Id.*

In the present case, Russo alleges that,

[f]rom April 23, 2020 until her termination, Plaintiff was an employee unable to work for Defendant and advised by a health care provider to self-quarantine due to concerns related to COVID-19. . . . Plaintiff was prevented from working because (A) Defendant refused to let Plaintiff (or any of its employees) work remotely and

(B) Plaintiff's health care provider medically advised Plaintiff to not work for Defendant at Plaintiff's normal workplace (Defendant's Brentwood office).

(Doc. No. 17 ¶ 91.) The plaintiff does not allege that she would have been able to return to work in July or August 2020 without some kind of accommodation, and she never attempted to return to work, instead maintaining that she was terminated effective July 17, 2020 when she was informed that, although she was being granted extended leave, Moore Ingram would not necessarily hold her position open. Even though the plaintiff appears to be alleging, like the plaintiff in *Jones*, that the facts may establish that she was terminated because of her disability and not because of inability to perform her job without either further leave or the accommodation of working from home, she simply cannot dispute that she was unable to return to work after the expiration of her twelve weeks of FMLA leave without some type of accommodation.

Because the defendant had no accommodation obligation under the TDA, the court will dismiss Counts IX and X for discrimination in violation of the TDA.

## C.     FMLA Claims

Under the FMLA, eligible employees are entitled to take up to twelve weeks of leave during any twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Employees who return to work within the twelve-week statutory period are entitled to return to their previous position or an equivalent position. 29 U.S.C. § 2614(a)(1). "An employer violates the FMLA when it 'interfere[s] with, restrain[s], or den[ies] the exercise of or the attempt to exercise' FMLA rights." *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427 (6th Cir. 2014) (quoting 29 U.S.C. § 2615(a)(1); citing *Bryson v. Regis Corp.*, 498 F.3d 561, 569–70 (6th Cir. 2007)). In addition, the FMLA prohibits employers from "discharg[ing] or in any other manner

discriminat[ing] against any individual for opposing any practice made unlawful" under the FMLA. 29 U.S.C. § 2615(a)(2).

In other words, "[t]here are two separate theories of recovery under the FMLA: the 'interference' theory"—based on 29 U.S.C. § 2615(a)(1)—"and the 'retaliation' theory"—based on § 2615(a)(2). *Gates v. U.S. Postal Serv.*, 502 F. App'x 485, 488 (6th Cir. 2012) (citing *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004)). The plaintiff in this case asserts claims based on both theories.

### 1. Count VII – FMLA Interference

To state an interference claim pursuant to the FMLA, the plaintiff must allege facts showing that (1) she was an eligible employee; (2) Moore Ingram was an employer subject to the FMLA; (3) the plaintiff was entitled to leave under the FMLA; (4) she gave Moore Ingram notice of her intention to take FMLA leave; and (5) Moore Ingram denied her FMLA benefits to which she was entitled. *Gates*, 502 F. App'x at 488–89 (quoting *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 840 (6th Cir. 2012)).

Moore Ingram argues that the plaintiff's FMLA interference claim is subject to dismissal because there is no dispute that the plaintiff was granted twelve weeks of leave but was not ready to return to work and, indeed, did not return to work even after being granted an additional thirty days of leave, beyond the twelve weeks authorized by the FMLA. In response, the plaintiff asserts that "basic math and consultation with a calendar" confirm that the defendant "incorrectly calculated the twelve weeks of FMLA leave." (Doc. No. 52, at 18.) She claims that, although she and the defendant both initially calculated her FMLA leave to expire on July 16, it actually did not expire until July 20, 2020. She also alleges that the defendant terminated her no later than July 17, 2020, based on Bill Johnson's letter informing her that Moore Ingram would not hold her job past

that date. As such, she claims, the defendant only provided her with eleven weeks and three days of leave and, thus, interfered with her FMLA leave.

Even assuming that the plaintiff is correct about the expiration date of her twelve weeks of FMLA leave,[10] her claim still fails, because she does not allege that she would have been medically ready to return to work on July 21, 2020. The Sixth Circuit has repeatedly "held that an employer does not violate the FMLA when it fires an employee who is indisputably unable to return to work at the conclusion of the 12-week period of statutory leave." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 506–07 (6th Cir. 2006) (collecting cases). This is because the FMLA is "not a strict-liability statute," and the employer's intention "is not a relevant part of the entitlement inquiry under § 2615," for purposes of an FMLA interference claim. *Id.* at 507. Accordingly, to establish liability on the part of the defendant, a plaintiff must show that she was harmed by the alleged interference. If it is undisputed that she could not return to work at the expiration of the leave period, then she has not been harmed. In this case, although the plaintiff alleges that she was fired before the expiration of the twelve-week period, she does not allege that she could have returned to work even if she had not been fired.

Insofar as the plaintiff claims that the defendant interfered with her FMLA rights when it "took no action to inform her (despite being required under the FMLA notice regulations to inform her) that it intended to require medical 'proof of recovery' at the end of the leave . . . and then

---

[10] The plaintiff is likely incorrect, because the FMLA permits an employer to "require an eligible employee to substitute accrued paid leave for unpaid FMLA leave, with such paid leave to run concurrently with the FMLA leave." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 281 (6th Cir. 2012). *See also Allen v. Butler Cty. Cmm'rs*, 331 F. App'x 389, 393 (6th Cir. 2009) (citing *Hicks v. Leroy's Jewelers, Inc.*, No. 98-6596, 2000 WL 1033029, *4 (6th Cir. July 17, 2000) ("[T]he regulations clearly provide that an employee's FMLA leave may run concurrently with paid medical or sick leave.")). Moore Ingram clearly designated the entirety of the plaintiff's leave as part of her twelve weeks of FMLA leave, including the paid time off from April 22 through 27, and it informed the plaintiff of the date when her FMLA leave was set to expire.

sprung on Plaintiff that this would be a requirement of her return" (Doc. No. 52, at 20), this claim fails too, again because the plaintiff does not allege that she would have been able to obtain that medical proof and return to work when her leave expired.

In sum, although Russo asserts that she alleges facts that reasonably give rise to an inference Moore Ingram interfered with her FMLA rights by terminating her effective July 17, she does not allege that she was ready to return to work on July 21 (or on August 17), as a result of which her FMLA interference claim fails as a matter of law. *Accord Edgar*, 443 F.3d at 509–10.

### 2. *Count VI – Termination in Retaliation for Asserting FMLA Rights*

To state a retaliation claim under the FMLA, the plaintiff must plausibly allege that (1) she engaged in a statutorily protected activity, such as taking FMLA leave or notifying her employer of her intent to take FMLA leave; (2) she suffered an adverse employment action; and (3) there was a "minimal causal connection between the adverse employment action and the protected activity—which includes indirect evidence of the causal connection such as the proximity in time between a request for FMLA leave and subsequent discharge." *Phelps v. Balfour, Commemorative Brands Inc.*, No. 3:11-CV-00622-CRS, 2013 WL 653542, at *3 (W.D. Ky. Feb. 21, 2013) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001)). For FMLA retaliation claims, unlike interference claims, an employer's intent is relevant. *See Edgar*, 443 F.3d at 512 ("What makes the employment decision unlawful under the [retaliation] theory is the motive of the employer—namely, that the action was taken *because* the employee exercised, or complained about the denial of, FMLA-protected rights.").

However, for cases in which it is undisputed that a plaintiff would not have been able to return to work upon the expiration of her FMLA leave, the Sixth Circuit has articulated the following rule, more applicable in the summary judgment context but still instructive here:

> [I]n retaliation cases where the medical information known to the employer prior to the termination decision shows that the employee could not return within 12 weeks, *Cehrs* [*v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775 (6th Cir. 1998),][11] and the DOL regulation [29 C.F.R. § 825.214][12] can be invoked by employers as a legitimate, nondiscriminatory reason for discharging the employee, *i.e.*, to rebut the employee's *prima facie* case of discrimination; and . . . in retaliation cases where the employer learns of the employee's inability to return to work only after the termination decision, *Cehrs* and the DOL regulation will not provide a defense to liability, but may limit the relief to which the employee is entitled in accordance with the after-acquired-evidence rule articulated in *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352 (1995).

*Edgar*, 443 F.3d at 513–14.

In this case, the defendant argues that the plaintiff cannot establish a causal connection between her exercise of protected activity and the adverse action or overcome the fact that she simply never returned to work after her extended FMLA leave. The defendant also argues that it is entitled to the "same actor inference." (Doc. No. 49, at 22.) In response, the plaintiff argues that the same actor inference does not apply to the consideration of a motion to dismiss, that the plaintiff plausibly alleges that the additional leave referred to in Bill Johnson's email was a sham, as he also stated that the company would not hold the plaintiff's job open beyond twelve weeks, meaning that he had decided by July 15 to terminate her employment, and that the Amended Complaint sets forth numerous facts sufficient to support an inference of causation, including that the defendant tried to discourage Russo from taking FMLA leave and that Johnson was angry with the plaintiff

---

[11] In *Cehrs*, the Sixth Circuit affirmed summary judgment for the employer on the plaintiff's FMLA claim, where it was undisputed that the plaintiff was "clearly unable to return to work within the period provided by the FMLA." 155 F.3d at 785.

[12] The cited regulation establishes an employee's right to be "returned to the same position the employee held when [FMLA] leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment . . . even if the employee has been replaced or his or her position has been restructured to accommodate the employee's absence." 29 C.F.R. § 825.214.

for taking FMLA leave and accused her of causing significant "discourse and turmoil." (Doc. No. 52, at 16–17.)

The court agrees with the plaintiff. Although there is no dispute that Russo did not attempt to return to work after the expiration of her initial leave period or extended leave period, and the defendant has proffered that failure as a legitimate non-retaliatory reason for her termination, the motion before the court is one to dismiss rather than one for summary judgment, and the plaintiff has no obligation at this juncture to have anticipated the defendant's rationale for its action or to rebut it in her pleading. And, in her pleading, she alleges that she engaged in protected activity by taking FMLA leave, that she suffered an adverse employment action; and that the decision to terminate her was made before the expiration of her extended leave period, thus giving rise, at least minimally, to an inference of a causal connection between the two. *See Phelps*, 2013 WL 653542, at *3. Accordingly, although the plaintiff's FMLA retaliation claim is admittedly weak, the court will not dismiss it at this juncture.

### D. FFCRA Claim

The Families First Coronavirus Response Act ("FFCRA") was signed into law on March 18, 2020, with an effective date of April 2, 2020. Pub. L. No. 116-127, 134 Stat. 178 (2020); 29 C.F.R. § 826.10(b). The FFCRA created two acts: the Emergency Family and Medical Leave Expansion Act ("EFMLEA") and the Emergency Paid Sick Leave Act ("EPSLA"). *Atwood v. JCF Residences Mgmt. Co.*, No. 1:20-CV-00056, 2022 WL 185187, at *4 (M.D. Tenn. Jan. 19, 2022). Both parts expired on December 31, 2020. *Kovacevic v. Am. Int'l Foods Inc.*, No. 1:21-cv-72, 2021 WL 3629756, at *2 (W.D. Mich. Aug. 17, 2021).

Only EPSLA is at issue here. This part of the FFCRA provided for two weeks of paid sick leave under qualifying circumstances. As relevant here, the implementing regulation states:

An Employer shall provide to each of its Employees Paid Sick Leave to the extent that Employee is unable to work due to any of the following reasons:

. . . .

(ii) The Employee has been advised by a health care provider to self-quarantine due to concerns related to COVID-19 . . . .

29 C.F.R. § 826.20(a)(1)(ii).

If an employee invokes subsection (a)(1)(ii), the following limitation applies:

An Employee may take Paid Sick Leave for the reason described in paragraph (a)(1)(ii) of this section only if:

(i) A health care provider advises the Employee to self-quarantine based on a belief that:

. . . .

(C) The Employee is particularly vulnerable to COVID-19; and

(ii) Following the advice of a health care provider to self-quarantine prevents the Employee from being able to work, either at the Employee's normal workplace or by Telework.

*Id.* § 826.20(a)(3).

The EPSLA requires employers to give notice of the requirements of the Act to their employees. Specifically, the employer "shall post and keep posted, in conspicuous places on the premises of the employer where notices to employees are customarily posted, a notice, to be prepared or approved by the Secretary of Labor, of the requirements described in this Act." FFCRA § 5103(a), 134 Stat. at 196. The pertinent regulation provides that "[e]very Employer covered by FFCRA's paid leave provisions is required to post and keep posted on its premises, in conspicuous places[,] a notice explaining the FFCRA's paid leave provisions and providing information concerning the procedures for filing complaints of violations of the FFCRA[.]" 29 C.F.R. § 826.80(a). "An Employer may satisfy this requirement by emailing or direct mailing this notice to Employees[.]" *Id.* § 826.80(b).

An employee requesting leave is generally required to provide documentation in support of the request "as soon as practicable," containing information including the employee's name, the date(s) for which leave is requested, the qualifying reason for the leave, and an "[o]ral or written statement that the Employee is unable to work because of the qualified reason for leave." *Id.* § 826.100(a).[13] To take paid leave under § 826.20(a)(1)(ii), the employee must also provide "the name of the health care provider who advised the Employee to self-quarantine due to concerns related to COVID-19." *Id.* § 826.100(c).

To state a claim for interference with EPSLA rights, a plaintiff must show that "(1) she was an eligible employee; (2) the employer was an employer as defined under the [EPSLA]; (2) she was entitled to leave under the [EPSLA]; (4) she gave the employer notice of her intent to take

---

[13] This version of the regulation actually did not go into effect until September 2020, after the events giving rise to this claim. As another court within the Sixth Circuit has explained:

> Shortly after being adopted, certain sections of the [rule as implemented in April 2020 (the "April Rule")] were challenged by the State of New York, including sec. 826.100 describing the documentation requirements. *New York v. U.S. Dep't of Lab.*, 477 F. Supp. 3d 1, 17–18 (S.D.N.Y. 2020). Specifically, New York highlighted a conflict in the April Rule between sec. 826.100's requirement of documentation prior to taking leave and sec. 826.90, which permitted notice, if required, to be provided after the first workday, or portion thereof, for which the employee took EPSLA leave. *Id.* at 18. New York contended that not only was the conflict in the timing between the provisions problematic, but the requirement that documentation be provided prior to an employee taking EPSLA leave was inconsistent with the language of the Act itself. *Id.* The court agreed and declared the "temporal aspect" of sec. 826.100 of the April Rule invalid. *Id.* The remainder of the documentation provision was not affected by the ruling in the New York case. *Id.* at 19.

> In response, the DOL changed the language of sec. 826.100 to match more closely that of sec. 826.90(a)(1). The "September Rule" provides that "[a]n Employee is required to provide the Employer documentation . . . as soon as practicable, which in most cases will be when the Employee provides notice under § 826.90." 29 C.F.R. § 826.100(a) (effective September 2020).

*Redmon v. Advanced Elec. Sys., Inc.*, No. 3:21-CV-90-CRS, 2021 WL 4477073, at *2 (W.D. Ky. Sept. 29, 2021)

---

leave; and (5) the employer denied her [EPSLA] benefits to which she was entitled." *Atwood*, 2022 WL 185187, at \*5 (addressing EFMLEA claim).

In this case, Russo alleges that, from April 23, 2020 until her termination, she was "an employee unable to work for Defendant and advised by a health care provider to self-quarantine due to concerns related to COVID-19 under 29 C.F.R. § 826.20(a)(1)(ii)," which she describes more particularly as "a belief and concern . . . that Plaintiff was particularly vulnerable to COVID-19." (Doc. No. 17 ¶ 91.) She also alleges that she was prevented from working during that time frame because the defendant refused to allow her to work remotely, and she was medically advised not to work in her normal workplace in the defendant's Brentwood office. (*Id.*) The plaintiff asserts that the FMLA documentation she provided to Moore Ingram on April 30, 2020 contained all of the information required by § 826.100(a) and (c), including her name, the dates for which leave was requested, a statement that she was unable to work because of a qualified reason for leave, and the name of the health care provider who advised that she self-quarantine due to COVID-related concerns. (Doc. No. 17 ¶¶ 92–93.) Finally, she alleges that, even though the defendant itself concluded that she was eligible for FFRCA leave, it did not inform her of that conclusion and did not pay her as required by the FFCRA. (*Id.* ¶¶ 95–96.)

Consistent with these allegations, Count VIII of the Amended Complaint sets forth a claim for violation of the FFCRA based on the defendant's failure to provide the plaintiff with two weeks of paid leave. (*Id.* ¶¶ 221–27.) In this section of her pleading, the plaintiff reiterates that her physician advised her to "self-quarantine based on a belief that Plaintiff was particularly vulnerable to COVID-19 in light of her family medical history." (*Id.* ¶ 223.) She also points out that the defendant knew the reason for which she sought leave and never notified her that it needed additional information to support a claim for FFCRA leave. (*Id.* ¶¶ 225–26.) And she attached to

her original Complaint the various doctor's notes that she provided to Moore Ingram in support of her requests for leave. (Doc. Nos. 1-7, 1-12.)

The plaintiff's initial doctor's note (undated but faxed to the defendant on April 24, 2020) identified the plaintiff, requested that the employer excuse her from work "for medical reasons" from April 23 through May 23, 2020, and was signed by Dr. Matthew Milligan. (Doc. No. 1-7.) On April 29, 2020, Dr. Milligan submitted additional paperwork in support of the plaintiff's request for FMLA leave. This document, besides identifying the plaintiff's name, the dates for which leave was requested (April 22 through June 1), and the doctor's name, stated the following reason for the requested leave: "Pt. has situational anxiety. Her workplace does not protect against Covid-19, and she has been denied work at home status. Given her family history of GB syndrome, this is ludicrous." (Doc. No. 1-12, at 2.)[14]

The defendant moves for dismissal of the plaintiff's FFCRA claim on the basis that the paperwork submitted by the plaintiff contradicts the allegations in the Amended Complaint that are based on that paperwork and that "[w]orking from home and self-quarantining are not the same thing." (Doc. No. 49, at 25 (citing *Toro v. Acme Barricades, L.C.*, No. 6:20-CV-1867-ACC-LRH, 2021 WL 3207632, at *5 (M.D. Fla. Apr. 9, 2021) (report and recommendation)).)[15] In response, the plaintiff does not contend that the first doctor's note is sufficient, but she argues that Dr. Milligan's FMLA paperwork contains all of the information required by the regulations. (Doc. No. 52, at 21.) She also points out that Jody Scott noted, in reviewing the plaintiff's paperwork, that

---

[14] The FMLA paperwork prepared by Dr. Milligan and submitted by the plaintiff in support of her request to extend her leave from June 1 through July 2020 only states "Situational anxiety related to Coronavirus" in support of the request to extend FMLA leave. (Doc. No. 1-16, at 2.)

[15] The court has reviewed the docket in *Toro*, which indicates that the plaintiff filed timely objections to the magistrate judge's report and recommendation, but the district judge never resolved the objections. Instead, the case settled in mediation. *Toro v. Acme Barricades, L.C.*, No. 6:20-cv-1867-Orl-22LRH (M.D. Fla. June 25, 2021) (Doc. No. 31).

GBS "would probably qualify for FFCRA." (*See* Doc. No. 42, at 21 (citing Doc. No. 1-19, at 2).) Scott also stated her belief that the law firm should "cover all [its] bases" by paying the plaintiff the two-weeks pay contemplated by the FFCRA. (Doc. No. 1-19, at 2.)[16]

The court finds that the allegations in the Amended Complaint and supporting exhibits are sufficient at this juncture to state a claim for violation of the FFCRA. In particular, the court notes that it is not clear that the defendant provided the notices to employees required by the statute, as a result of which it is not clear that the plaintiff was even aware that she might be entitled to two weeks of pay under the EPSLA part of the FFCRA. For that reason, the court is not persuaded, for purposes of the defendant's Motion to Dismiss, that the plaintiff's notice obligations should be strictly applied. Moreover, it is apparent from the communications among the defendant's agents that they were aware that the plaintiff was requesting leave for a reason covered by the FFCRA: that she and her physician both believed that the plaintiff should self-quarantine—that is, not work at the office—because she was "particularly vulnerable to COVID-19" due to her family history of GBS. 29 C.F.R. § 826.20(a)(3)(i)(C).

The court also finds unpersuasive the defendant's attempt to argue that "[w]orking from home and self-quarantining are not the same thing" (Doc. No. 49, at 25). The regulation expressly authorizes paid sick leave if an employee who follows a health care provider's advice to self-quarantine is thereby "prevent[ed] from being able to work, either at the Employee's normal workplace or by Telework." 29 C.F.R. § 926.20(a)(3)(ii). The plaintiff's doctor's notes, read together, clearly indicated that Russo should be permitted to telework and, if not permitted to

---

[16] The plaintiff mistakenly identifies HR Manager Catherine Larkins, rather than Office Manager Jody Scott, as having made these comments. (*See* Doc. No. 52, at 21, 22.)

telework, that she should be on leave from work altogether. The doctor did not use the words "self-quarantine," but his intention was clear.

The court is also not persuaded by the defendant's reliance on *Toro v. Acme Barricades*. Besides the fact that the case was a report and recommendation rather than an actual order, and the objections to it were never resolved (*see* Note 16, *supra*), the case is inapposite on the facts. The plaintiff there alleged in his complaint that he had a health condition that placed him at greater risk if he contracted COVID-19, but none of the doctor's notes he provided supported that claim, identified a condition that placed him at increased risk, or requested that he be granted leave for that reason. The first doctor's note requested three days of leave, apparently "related to a condition with Plaintiff's hands." 2021 WL 3207632, at *2. The note stated "COVID-19 – virus not identified" and recommended follow up with a dermatologist. *Id.* The defendant employer denied the plaintiff additional leave based on that note but recommended to the plaintiff that he see his primary care physician. The primary care physician also advised the plaintiff to "work from home," but the note he provided stated only: "Please excuse from work as long as possible due to concerns of contracting COVID-19." *Id.* As the court observed, this note did not state that the plaintiff was particularly vulnerable to COVID-19 or why, and it did not otherwise comply with the notice requirements set forth in the regulations. For both of those reasons, the magistrate judge recommended that the defendant's motion to dismiss the FFCRA claim be granted. *Id.* at *6.

In this case, the plaintiff's doctor's first FMLA request functionally satisfies the regulatory requirements of 29 C.F.R. §§ 826.20 and 826.100, and the plaintiff's factual allegations in the Amended Complaint are sufficient to state a claim under the FFCRA. The motion to dismiss this claim will be denied.

### E. TPPA Claim

Under Tennessee law, "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b). To prevail on a whistleblower claim under the TPPA, "an employee must establish that he or she reported the employer's illegal activity and that the reporting of the illegal activity furthered a clear public policy." *Haynes v. Formac Stables, Inc.,* 463 S.W.3d 34, 37 (Tenn. 2015) (citation and internal quotation marks omitted).

The plaintiff alleges that, in her July 16, 2020 email to Bill Johnson, she "complained of, and refused to remain silent about, Defendant's violation of the general duty clause of the federal Occupational Safety and Health Act by unreasonably failing to protect Defendant's employees, including those in Defendant's Brentwood office, from hazards in the workplace, including unreasonably failing to protect employees from unnecessary COVID-19 exposure." (Doc. No. 17 ¶ 147; *see also* Doc. No. 1-21, at 3–4.) Under Count XI of the Amended Complaint, she asserts, based on the factual allegations in paragraph 147, that she "refused to remain silent about Defendant's illegal activity, including Defendant's violation of the general duty clause of the Occupational Safety and Health Act and/or Defendant's violation of the Americans with Disabilities Act in connection with its refusal to permit Plaintiff and other employees to work remotely in light of an unprecedented pandemic." (Doc. No. 17 ¶ 236.) The plaintiff also asserts that she was "terminated . . . solely for [her] refusal to remain silent about Defendant's illegal activity." (*Id.* ¶ 238.)

The defendant argues that (1) aside from her termination and the denial of her request to work from home, the plaintiff has not alleged that Moore Ingram engaged in any other illegal activity; and (2) the plaintiff has not shown that her activity was the exclusive or sole cause for her termination. (Doc. No. 49, at 30.) In response, the plaintiff points out that she expressly alleges

that she identified the illegal activity in question: the defendant's alleged violation of the "general duty clause of the Occupational Safety and Health Act." (Doc. No. 52, at 23.) Citing *Davis v. Vanderbilt University Medical Center*, No. M2019-01860-COA-R3-CV, 2020 WL 4516094 (Tenn. Ct. App. Aug. 5, 2020), *app. denied* (Nov. 12, 2020), Russo argues that the Tennessee Court of Appeals has recognized that complaints regarding this type of activity can state a claim under the TPPA and that she was "promptly terminated" after making this complaint. (*Id.* at 24.) Indeed, in *Davis*, the court held that reporting "an alleged violation of OSHA's general duty clause for inadequate workplace violence safeguards" could support a TPPA claim. *Davis*, 2020 WL 4516094, at *5; *see id.* at *6 (citing *Mason v. Seaton*, 942 S.W.2d 470, 471 (Tenn. 1997), as affirming the appellate court's reversal of a trial court's grant of summary judgment to a defendant for failure to state a claim in a TPPA case based on an OSHA violation).

Moreover, the plaintiff also clearly complained that the defendant was violating the ADA by refusing to accommodate her alleged disability. (*See* Doc. No. 1-21, at 2.) In 2021, the TPPA was amended to exclude from the definition of "illegal activities" activities prohibited under Tenn. Code Ann. Title 4, ch. 21 (the Tennessee Human Rights Act), Tenn. Code Ann. § 8-50, 103 (the TDA), and "federal laws prohibiting discrimination in employment." Tenn. Code Ann. § 50-1-304(a)(3)(B) (2021 Pub. Acts, c. 556, § 1, May 26, 2021). This law went into effect upon its passage, but there is no indication that it was intended to apply retroactively to conduct predating its passage. Accordingly, the plaintiff's complaint about violations of the ADA and FMLA could also give rise to a TPPA retaliation claim.

The plaintiff does not address the defendant's argument about the absence of a causal connection between her protected activity and her termination. Indeed, the only basis for causation alleged by the plaintiff is the acute temporal proximity between her engaging in allegedly protected

activity and the defendant's alleged decision to terminate her employment. While Tennessee courts have repeatedly affirmed that temporal proximity, even acutely close temporal proximity, standing alone, is not sufficient to establish causation, *see, e.g.*, *Mason v. Seaton*, 942 S.W.2d 470, 473 (Tenn. 1997) ("[P]roximity in time between the protected act and the discharge is not sufficient to establish a causal relationship [for purposes of a TPPA claim]." (citing *Conatser v. Clarksville Coca–Cola*, 920 S.W.2d 646 (Tenn. 1995)), the Tennessee Supreme Court has also held that acute temporal proximity between protected activity and an adverse employment action constitutes circumstantial evidence of causation, triggering the employer's burden to submit proof of its reason for the adverse action. *Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 31 (Tenn. 2011). Thus, Russo's allegation of acute temporal proximity is sufficient to give rise to an inference of a causal connection. The defendant may dispute the plaintiff's allegations on a motion for summary judgment, but, for now, the court resolves this issue in favor of the plaintiff.

At this stage, again, the allegations in the Amended Complaint are sufficient to give rise to a reasonable inference that the plaintiff engaged in activity protected by the TPPA and that she was terminated because of that activity.[17]

---

[17] Notably, under Tennessee law, "the public policy underlying the whistleblower protections precludes relief for an employee who merely reports unlawful activity to the person responsible, even when that person is the manager, owner, or highest authority within the company." *Haynes*, 463 S.W.3d at 40. In this case, it is questionable whether the plaintiff's complaint to Bill Johnson, Moore Ingram's "Administrative Partner (the highest member of management)" (Doc. No. 17 ¶ 1), about acts in which the law firm as a whole was engaged would qualify as reporting illegal activity to "someone other than the offending party." *Haynes*, 463 S.W.3d at 39. The parties do not address this issue, however, so the court does not attempt to resolve it.

## IV.    CONCLUSION

For the reasons set forth herein, the court will grant in part and deny in part the defendant's Motion to Dismiss. Specifically, the motion will be granted as to the plaintiff's FMLA interference claim and TDA claims (Counts VII, IX, and X), and those claims will be dismissed. In all other respects, the motion will be denied. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge